1

2

3

4

5

6 IN THE UNITED STATES DISTRICT COURT

7

8 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 JULIE WOOL,                                    No. C 07-00646 WHA

11          Plaintiff,

12    v.                                          **ORDER GRANTING MOTION
                                                  FOR SUMMARY JUDGMENT**
13 WEIL, GOTSHAL & MANGES, LLP,

14          Defendant.

15 _____/

16                              **INTRODUCTION**

17        In this wrongful-termination action, legal secretary Julie Wool sued defendant law

18 firm Weil, Gotshal & Manges for alleged age discrimination.  Defendant moves for summary

19 judgment on the grounds that (i) plaintiff may not recover for any alleged discriminatory acts

20 that fell outside the statute of limitations; (ii) plaintiff cannot establish age discrimination;

21 and (iii) the law firm paid all of plaintiff's accrued vacation time when her employment ended.

22 Plaintiff concedes her vacation-pay claim.  For the reasons stated below, the motion for

23 summary judgment is **GRANTED**.

24

25

26

27

28

*United States District Court*
*For the Northern District of California*

**STATEMENT**[1]

Plaintiff began working as a legal secretary in Weil's corporate law group on March 4, 2000. Before her move to Weil, Plaintiff Wool worked at law firm Heller Ehrman LLP where, according to her deposition, she received top performance reviews. She joined Weil in March 2000, attracted by the increased salary, bonus, and prospect of working for a partner.

At Weil, she was assigned to two attorneys — managing partner Craig Adas and associate Kyle Krpata. For the first few months, she had no problems working with Partner Adas. In November 2000, Plaintiff Wool turned fifty years old. According to her, Partner Adas seemed "shocked" and "surprised" when she told him her age. She could not, however, recall whether he made any comments that were negative about her age, nor could she recall that he had ever made negative comments about older workers. She did, however, believe that he changed his attitudes towards her after he discovered her age.

At her deposition, when asked what had happened to cause her to believe that there was less rapport and friendship, Plaintiff Wool responded, "He walked by my desk and wouldn't say hi or he would just not act friendly towards me. He wouldn't take me to lunch anymore. He wouldn't joke with me or make chitchat. He was just — I felt that there was definitely a change in his attitude" (Wool Dep. 33). Plaintiff Wool was also asked whether "there [was] anything else [aside from timing] that caused [her] to believe [the change in attitude] was related to [her] age." She answered, "No, I guess I can't pinpoint anything" (*id.* at 34).

In June 2001, Plaintiff Wool received her first annual performance review from Partner Adas, which covered the period from May 31, 2000, through June 1, 2001. Possible rankings were (from best to worst): "far exceeds," "exceeds," "consistently meets," "meets most," and "does not meet." For most of the reviewed factors, Plaintiff Wool received

---

[1] Defendant makes numerous objections to the evidence proffered by Plaintiff Wool — especially performance reviews from Wilson Sonsini Goodrich & Rosati, the declaration from paralegal Anita Scelsa, and portions of Plaintiff Wool's deposition (which include statements about her performance at Heller) — on the grounds of irrelevance or hearsay. This order need not determine whether any of the objections have merit. Even if we assumed all of Plaintiff Wool's evidence was admissible (which it is not), she would still lose on summary judgment.

2

United States District Court

For the Northern District of California

1    an "exceeds" or "consistently meets."  According to the evaluation, she needed to improve her

2    punctuality and filing — "too often stacks of documents sit on her desk for weeks or months at

3    a time."  She spent too much time making personal calls and taking long lunch breaks (Wool

4    Dep. Exh. 1).

5          Associate Krpata also prepared a separate performance review for that period.  For most

6    job responsibilities, Plaintiff Wool received "consistently meets."  She did, however, require

7    improvement in the following duties: preparation of high-quality work product, filing and

8    organizational skills, and punctuality.  Supporting comments stated that she made errors when

9    she edited documents (because she talked on the phone at the same time), she did not always

10   file in a timely manner, she let projects sit around, she often arrived fifteen minutes after 9:00

11   a.m., she took long lunches, and she spent too much time making personal calls (Krpata Decl.

12   Exh. 1).

13         In 2001, Plaintiff Wool was reassigned. A partner had moved back to Texas and his

14   secretary, Sophia Tabakis, began working with Partner Adas.  As a result, Plaintiff Wool was

15   reassigned to work with Associate Krpata and Phillip Pierpont (both of whom were associates

16   at the time).  Many months had passed between the time Partner Adas first discovered

17   Plaintiff Wool was fifty years old (November 2000) and the time of reassignment.  In her

18   deposition, Plaintiff Wool said that she was "immediately switched when [the partner who

19   moved to Texas] left abruptly," which was about "three months" after Secretary Tabakis started

20   working (Wool Dep. 38–39).  The summary-judgment record does not pinpoint the exact date

21   when the partner left or when Secretary Tabakis started at Weil.  Plaintiff Wool did, however,

22   state that Secretary Tabakis interviewed with her in December 2000 and that the partner left a

23   few months after the interview (*id.* at 34–35).  At the *earliest*, Plaintiff Wool was reassigned

24   after March 2001.

25         Plaintiff Wool did not believe that the reassignment was work-related.  Secretary

26   Tabakis was five years younger than Plaintiff Wool.  In her deposition, Plaintiff Wool said that

27   she asked Partner Adas whether there was anything she had done, and he purportedly

28   responded, "Not at all.  It has nothing to do with your superior work ability" (Wool Dep. 41).

3

**United States District Court**
For the Northern District of California

1    Upset at the move, Plaintiff Wool then told Partner Adas "prestige comes with working for a

2    partner . . .  Working with a partner was no way comparable to working with a first year" (Wool

3    Dep. 41).  Nonetheless, Plaintiff Wool now worked for the associates.

4           On October 11, 2001, head of human resources Margaret Venturini met with

5    Plaintiff Wool.  Ms. Venturini brought up the subject of Plaintiff Wool's long lunches.

6    When asked whether she recalled the conversation, Plaintiff Wool responded, "It's possible

7    because there was a little shift in the way I got to work and where we would go to lunch and

8    that sort of thing.  So it's possible that that was something that was brought up at that time"

9    (Wool Dep. 160).

10          In June 2002, Plaintiff Wool received another round of performance reviews covering

11   the period from June 1, 2001, through May 31, 2002.  Again, for most job responsibilities,

12   she received "consistently meets."  She nevertheless continued to face problems regarding

13   attendance and punctuality — Associate Krpata commented, "Julie is often out of the office and

14   it is difficult to build consistency" (Krpata Decl. Exh. 2).

15          That same year, Plaintiff Wool was assigned to work with associate Judiah Schiller,

16   a recent law-school graduate.  She said that she "was shouted at, yelled at" and called "inept."

17   She could not recall Associate Schiller making any other age-related comment besides her being

18   "not as good of a secretary that he would expect of someone [her] age" (Wool Dep. 60).

19   Neither Associate Schiller nor Plaintiff Wool wanted to work with each other, so Plaintiff Wool

20   was eventually reassigned to another attorney.  Associate Schiller left Weil shortly thereafter.

21   No one ever told Plaintiff Wool that Associate Schiller had said or done anything that

22   contributed to her eventual termination.

23          Plaintiff Wool was reviewed again in June 2003 for the period between June 1, 2002,

24   and May 31, 2003.  Her ratings were primarily "exceeds," with some "consistently meets."

25   Plaintiff Wool had improved her punctuality during this work period.  Associate Krpata,

26   however, wrote, "Generally work product is very good.  However, mistakes are made when

27   Julie is not focused" (Krpata Decl. Exh. 3).

28

United States District Court

For the Northern District of California

In December 2003, Associate Krpata requested that Paula Donaldson, human resources administrator, speak to Plaintiff Wool about Plaintiff Wool's frequent tardiness.  Ms. Donaldson met with Plaintiff Wool in January 2004.  Two months later, Ms. Donaldson sent Plaintiff Wool a written warning.  The memorandum listed occasions in March when Plaintiff Wool's "punch times" did not accurately reflect her frequent tardiness.  For example, on March 5, 2003, her observed arrival time was 9:14 a.m., but her punch time was 9:00 a.m.  On March 9, 2003, her observed arrival time was 9:17 a.m. but her punch time said 9:00 a.m.  Finally, on March 15, 2003, her observed arrival time was 9:17 a.m. but her punch time said 9:00 a.m. again.  Ms. Donaldson emphasized in the memorandum, "It is essential that you take immediate steps to arrive on time (9:00 a.m.), and to enter your punches to reflect your true arrival, break and departure times.  Failure to do so will subject you to further disciplinary action, including possible discharge at any time."  The last sentence in the memorandum stated, "I acknowledge receiving the above written warning and understand that failure to improve my punctuality and to accurately punch in at the time I actually arrive, may lead to termination of my employment."  Plaintiff Wool's signature followed the last sentence (Wool Dep. Exh. 4).

Associate Krpata prepared another performance review in May 2004 for the period between June 1, 2003, and May 31, 2004.  This time, Plaintiff Wool received "consistently meets" and "meets most."  There were the following negative comments.  With respect to Plaintiff Wool's preparation of high-quality work product, Associate Krpata wrote, "Word processing work needs improvement.  Too many projects come back with errors and do not appear to have been reviewed before being returned."  For telephone-answering, he wrote, "My phone routinely goes unanswered.  Often, it appears that Julie is on her line when my calls are missed."  For filing and organizational skills, Associate Krpata wrote, "My filing is not as organized as I would like.  Files have been out of order.  Also, I found files on the floor outside of my cabinet."  Regarding punctuality, he commented, "This is a major concern for me.  Julie's arrival times are unpredictable.  We have discussed this on more than one occasion.  Long lunches were also a problem during this review period."  He listed the following key areas for growth for the next performance period:  (i) attention to detail; (ii) punctuality and

attendance; (iii) more time at desk; (iv) fewer personal calls; and (v) increase focus on job (Krpata Decl. Exh. 4).

In June 2004, Plaintiff Wool received her "support staff performance review compilation" from three attorneys with whom she worked (Evelyn Hsu, Kyle Krpata, and Andrew Nelson). Although describing Plaintiff Wool as personable and friendly, the review listed numerous problems. She was requested to immediately begin working on the following areas of concern (Wool Dep. Exh. 6):

> (i) Be attentive to attorney's needs and increase focus on job-related matters. Keep attorneys apprised of status of assignments.
>
> (ii) Be more detail-oriented in document work. Improve document quality, carefully proofread documents before returning to attorneys. Take a few minutes extra to be sure everything is complete and accurate.
>
> (iii) Improve your follow-through with projects, so attorneys don't feel they have to double check to be sure things are getting done.
>
> (iv) Be punctual, ready to work, take regular lunch hours, refrain from all unnecessary personal phone calls, and avoid being absent from the desk for long periods of time.
>
> (v) Project a more professional and positive attitude in the office and express more energy when on the phone with clients.

The final sentence in the review read, "Please be aware that if improvement is not made as described above, disciplinary actions could ensue" (*ibid*.). At that point, Plaintiff Wool knew that "'meets most' was a less than satisfactory overall grade" — "I knew it was because I didn't get a raise, and I also knew it was because I was on probation, and I knew it was because I was going to get reviewed again in three months . . . And I knew disciplinary action could be ensued. So this is not all good" (Wool Dep. 166).

The follow-up review occurred on September 23, 2004. It noted that Plaintiff Wool had become more attentive, focused, detailed-oriented, and punctual. There was, however, not enough improvement. The review stated (Wool Dep. Exh. 7):

> We commend the efforts you have made to improve and encourage you to continue making progress toward fully reaching the above performance goals. Due to your tenure with the Firm, the deficiency of your performance at review time, and continued performance concerns, it is felt that you have not fully achieved

6

United States District Court

For the Northern District of California

> the level expected of a legal secretary with 10+ years of experience.  You will need to continue to raise your level of performance and then maintain your performance at a high level, which will be reviewed in another 90-day period from this date.  Sustained decrease in performance after successfully accomplishing the performance goals set above, may result in further disciplinary action, including possible dismissal from the Firm without the issuance of another warning or improvement period.

She was given a final warning on January 3, 2005.  The four-paged, single-spaced memorandum went into lengthy detail about areas of concern.  It listed numerous examples of "ongoing poor performance issues" — *e.g.*, frequent personal calls, difficulty completing projects in a timely manner, inaccurate punch times that did not reflect her true (late) arrival time, poor work quality, and long lunch hours.  The final-warning letter also provided an example of her inefficient job performance tracked during a single day.  One of the last paragraphs stated (Wool Dep. Exh. 8):

> Given the concerns noted above, and the continuing lack of improvement over the two past 90-day probationary periods, this is a final warning.  If sustained improvement is not made and confirmed by your attorneys within the next 90 days as noted above, and noted in your performance review in June 2004 and your Performance Plan dated September 23, 2004, you may be terminated at any time without the issuance of another warning or improvement period.

By this point, Partner Adas had discussed Plaintiff Wool's problematic job performance several times with Ms. Donaldson.  He knew that, at a review, Plaintiff Wool had expressed some concern that the firm was trying to terminate employees to prevent them from reaching five years of employment, which was when employees' rights to the firm's matching contribution to the 401k plan would vest.  Although he believed that the firm had given Plaintiff Wool ample notice of the problems and opportunities to improve, he decided to extend Plaintiff Wool's employment until after her rights had vested.  Finally, Partner Adas and other attorneys that had worked with Plaintiff Wool decided that termination was appropriate because she had failed to achieve satisfactory performance despite having been given multiple opportunities to improve.  The firm terminated Plaintiff Wool's employment on April 14, 2005.  Plaintiff Wool now works for Wilson Sonsini, where she said that she received "excellent

7

reviews" (Wool Decl. Exhs. 1–5). [2]

At her deposition in May 2007, Plaintiff Wool denied that there were problems with time — "[s]o time issues were mentioned, but they were always resolved" (Wool Dep. 146). She also gave the following examples of age-discrimination.  Plaintiff Wool testified that she "was aware that other women my age were getting — being put on probation and being given a hard time" (Wool Dep. 142–43).  Plaintiff Wool pointed to the following as an example of age-related comments made by her supervisor, Ms. Donaldson, regarding her attitude and demeanor (*id.* at 148–49):

> Q:  What issues are you defining as clearly age-related issues?
>
> A:  Issues that only somebody with youth and vigoration [sic] could do.  Enter the room and say, "Show time."  That's how she wanted you to come to work.  She told the workers, all of us at one time that that's the way you needed to come to work, just as if you were doing a performance and you just came to work, and you put all your thoughts behind, and you just came in there like you were ready on fire.  You were on show time.  She said that I didn't have that enthusiasm.  "Enthusiasm" was a real big word for her that she bandied around.  Enthusiasm, being with it, fun, making — "Do you like your job?"  It was like she was working at the Fish Market in Seattle or something instead of at a law firm.  In fact, she handed out something from the Fish Market in Seattle that we were supposed to look at, like this is the kind of enthusiasm she was looking for, and I didn't have that.

Plaintiff Wool further testified that younger employees were treated more leniently than she was treated with respect to time records.  Her interviewer pointed out that one of the employees mentioned was actually older than Plaintiff Wool (*id.* at 153):

---

[2]  The exhibits do not show "excellent reviews" across the board.  On her 2007 Wilson Sonsini performance evaluation summary for secretaries, there was one category called "Attention to Firm Policies: Provides advance notice and coverage for PTO [paid time off]; consistent attendance and punctuality; works overtime/additional hours as necessary, when required."  Beneath this category was the following comment: "(1) You joined the firm in August 2006. (2) You accrued 28.98 hours of negative PTO during the review period.  You are reminded that the firm's policy prohibits accumulation of negative PTO hours."  The review also stated that, for an area of improvement, she "should continue to improve [her] proofreading skills" (Wool Decl. Exh. 1).  The rest of these exhibits were all August 2007 emails commending Plaintiff Wool on the same indexing project (*id.* Exhs. 3–5) (Exh. 2 was not included in the record).

United States District Court
For the Northern District of California

Q: Okay. And what of that said that younger employees were getting special attention?

A: Because other younger employees could enter their time any old way they wanted to and they weren't being counseled about entering — people would brag to me — Linda Stankovic, a [twenty-five year old] paralegal, came in and she said, "I enter my time whenever I feel like it. I enter it at night. It doesn't matter. I enter them the next day." Another attorney — I think it was Anne Hansen told me that she entered her time a specific way that didn't have anything to do with the way they were telling me to enter the time.

Q: Anne Hansen was about the same age as you?

A: Actually she was older.

Q: That wasn't an age-related difference?

A: That one wasn't.

According to Plaintiff Wool, after she was fired, associate Andy Nelson told her that "there was no way you could have ever gotten off your probation" (*id.* at 156).

During a second deposition, Plaintiff Wool testified further about observing age discrimination against older secretaries. She felt that "[f]ifties were going out; thirties were coming in" (*id.* at 271). She was also asked, however, "Was there anybody who worked at Weil, Gotshal that told you they had heard anyone saying, 'It would be more difficult to work at Weil, Gotshal being over 50' or words to that effect?" Plaintiff Wool answered, "No. I can't really recall that kind of language being used, but the reality of it was true" (*id.* at 270).

On February 6, 2006, Plaintiff Wool filed her complaint of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). While she awaited a response from the EEOC, Plaintiff Wool also filed a complaint with the California Department of Fair Employment and Housing ("DFEH") on April 13, 2006. The next day, the DFEH sent her a right-to-sue notice. On December 11, 2006, the EEOC issued a notice of the right to sue in response to her February complaint.

On January 31, 2007, Plaintiff Wool filed suit against Weil, alleging the following: (i) violation of the Age Discrimination in Employment Act; (ii) violation of the California Fair Employment and Housing Act; violation of California public policy based upon alleged

1  violations of ADEA and FEHA; and (iv) failure to pay accrued vacation time.  Defendant

2  moves

3  for summary judgment.  Because plaintiff has conceded the vacation-pay claim, this order will

4  only address the remaining three counts.

**ANALYSIS**

6       Summary judgment is granted when "the pleadings, depositions, answers to

7  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

8  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

9  matter of law."  FRCP 56(c).  A district court must determine, viewing the evidence in the light

10  most favorable to the nonmoving party, whether there is any genuine issue of material fact.

11  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue

12  of fact is one that could reasonably be resolved, based on the factual record, in favor of either

13  party.  A dispute is "material" only if it could affect the outcome of the suit under the governing

14  law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[3]

15       The moving party "has both the initial burden of production and the ultimate burden of

16  persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

17  Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).  When the moving party meets its initial

18  burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and

19  by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

20  designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*,

21  477 U.S. 317, 324 (1986).

22       **1.    ARE ANY OF THE ALLEGED DISCRIMINATORY ACTS TIME-BARRED?**

23       In her complaint, Plaintiff Wool alleged the following acts of discrimination:

24  her reassignment from Partner Adas (a partner) to associate attorneys in June 2001;

25  having inappropriate age-related statements made to her by associate Judiah Schiller in 2002;

26  being disciplined and placed on probation in June 2004; and being terminated on April 14,

27

28

_____

[3] Unless indicated otherwise, internal citations are omitted from all cites.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   2005.  The other allegations were too vague and conclusory to constitute discrete acts of

2   discrimination.[4]

3        In Count One, Plaintiff Wool alleges a violation of ADEA.  According to *National R.R.*

4   *Passenger Corp. v. Morgan*, 536 U.S. 101, 110-113 (2002):

> A discrete retaliatory or discriminatory act "occurred" on the day
> that it "happened."  A party, therefore, must file a charge [with the
> EEOC] within either 180 or 300 days of the date of the act or lose
> the ability to recover for it [in a Title VII action] . . .  [D]iscrete
> discriminatory acts are not actionable if time barred, even when
> they are related to acts alleged in timely filed charges.  Each
> discrete discriminatory act starts a new clock for filing charges
> alleging that act. The charge, therefore, must be filed within the
> 180- or 300-day time period after the discrete discriminatory act
> occurred. The existence of past acts and the employee's prior
> knowledge of their occurrence, however, does not bar employees
> from filing charges about related discrete acts so long as the acts
> are independently discriminatory and charges addressing those acts
> are themselves timely filed. Nor does the statute bar an employee
> from using the prior acts as background evidence in support of a
> timely claim.

Therefore, while Plaintiff Wool can use prior acts of alleged discrimination as background

evidence to support a timely claim, she cannot recover for these prior acts if they fell outside the

statute of limitations.  Plaintiff Wool filed her charge with the EOC on February 6, 2006.

She cannot recover under the ADEA for any events that took place before April 12, 2005

(which is 300 days before the EEOC filing on February 6, 2006).

     Plaintiff Wool then alleges a violation of the FEHA in Count Two.  "No complaint may

be filed after the expiration of one year from the date upon which the alleged unlawful practice

or refusal to cooperate occurred."  Cal. Gov. Code § 12960.  See also *Cucuzza v. City of*

*Santa Clara*, 104 Cal. App. 4th 1031, 1040 (2002).  Plaintiff filed a charge with the DFEH on

April 13, 2006.  Again, any prior act occurring before April 2005 (a year before the filing with

DFEH) would be time-barred under FEHA.

---

[4]  She made broad claims such as, "[f]rom June, 2001, through April, 2005, Plaintiff observed that Defendant engaged in a pattern and practice of age discrimination against older secretaries"; "Plaintiff was disciplined for conduct which was tolerated in younger secretaries.  Plaintiff had not engaged in misconduct in the first place"; and "[w]hile on probation, for ten months, Plaintiff was subject to age-biased comments from Defendant, such as lacking enthusiasm, energy and attitude, not being with it, not being plugged in, and lacking freshness" (Compl. ¶¶ 10, 13–14).

**United States District Court**
For the Northern District of California

1    In Count Three, Plaintiff Wool alleges that Weil violated California public policy,

2    as set forth in ADEA and FEHA.  This claim is not barred by the same limitations period.

3    In *Carmichael v. Alfano Temporary Personnel*, 233 Cal. App. 3d 1126, 1131-32 (1991),

4    the state court found that an employee's action against his employer was not barred by the

5    one-year statute of limitations governing the filing of civil actions under FEHA.

6    The employee's action alleged a common-law claim of employer retaliation that was

7    independent of FEHA and there was a strong public policy against sexual and racial

8    discrimination.  Instead, California tort law provides the proper statute of limitations for

9    commencing civil actions:  "Within two years:  An action for assault, battery, or injury to, or for

10   the death of, an individual caused by the wrongful act or neglect of another."  Cal. Civ. Pro.

11   335.1.  Plaintiff Wool filed her complaint on January 31, 2007.  Any allegedly discriminatory

12   acts occurring before January 31, 2005, were time-barred.

13          Plaintiff Wool argues that the statute of limitations does not bar anything in this case.

14   As discussed earlier, her blanket assertion is incorrect.  While previous acts of alleged

15   discrimination can be considered as background evidence of a timely claim, they cannot serve

16   as discrete acts of discrimination upon which plaintiff can recover for Counts One through

17   Three.  The decisions cited by plaintiff are consistent with this view.  *See National R.R.*

18   *Passenger Corp.*, 536 U.S. at 110-113; *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028,

19   1056–59 (2005).[5]      It is not entirely clear from plaintiff's memorandum why plaintiff's

20   counsel cited *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 593–95 (6th Cir.

21   2007), because no explanation was given.  This order will assume that the Sixth Circuit's

22   decision was cited for the definition of an adverse employment action in the context of a Title

23   VII discrimination claim:  "A materially adverse change in the terms and conditions of

24

25          [5]  In *Yanowitz*, the California Supreme Court held that "foreclosing the application of the continuing
     violation doctrine in a case such as this one, where the plaintiff alleges a retaliatory course of conduct rather

26   than a discrete act of retaliation, would undermine the fundamental purpose of the FEHA by encouraging early
     litigation and the adjudication of unripe claims.  We believe the better rule is to allow application of the

27   continuing violation doctrine in retaliation cases if the requisite showing of a continuing course of conduct has
     been made.  Thus, we reiterate that in a retaliation case, as in a disability accommodation or harassment case,
     the FEHA statute of limitations *begins to run when an alleged adverse employment action acquires some degree*

28   *of permanence or finality.*"  *Yanowitz*, 36 Cal. 4th at 1058–59 (emphasis added).

United States District Court
For the Northern District of California

employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Michael*, 496 F.3d at 594.  Plaintiff then concedes that "[n]o adverse employment action occurred until termination of employment on April 14, 2005" (Opp. 5).  This is consistent with Weil's statute-of-limitations argument; the main act in dispute is the firm's decision to terminate Plaintiff Wool.

Plaintiff Wool also cites *Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479 (1996).  There, the California Supreme Court held that the statute of limitations on a plaintiff's action for breach of contract accrued when the plaintiff was actually discharged, not when the employer informed the plaintiff of its decision to terminate him on the date he reached a certain number of points under his retirement plan.  In *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823–24 (2001), the California Supreme Court held, "[W]hen an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain."  Again, Weil does not contend otherwise.

In sum, the April 2005 termination is the only act of discrimination that survives the statute of limitations.  For Plaintiff Wool to prevail, she must show that Weil terminated her employment because of her age.

### 2.   HAS PLAINTIFF ESTABLISHED AGE DISCRIMINATION?

The Supreme Court has assumed that the *McDonnell Douglas* burden-shifting framework (discussed below) is fully applicable in ADEA cases where parties do not dispute the issue.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000).  California

United States District Court

For the Northern District of California

1    uses the same test.  "California has adopted the three-stage burden-shifting test established by

2    the United States Supreme Court for trying claims of discrimination, including age

3    discrimination, based on a theory of disparate treatment."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th

4    317, 353 (2000).  Neither party disputes the use of the *McDonnell Douglas* analytical

5    framework.

6          The three steps are as follows.  *First*, "the *McDonnell Douglas* test places on the

7    plaintiff the initial burden to establish a prima facie case of discrimination.  This step is

8    designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is

9    not a member of the protected class or was clearly unqualified, or where the job he sought was

10   withdrawn and never filled.  While the plaintiff's prima facie burden is 'not onerous,' he must

11   at least show 'actions taken by the employer from which one can infer, if such actions remain

12   unexplained, that it is more likely than not that such actions were based on a [prohibited]

13   discriminatory criterion.'"  *Guz*, 24 Cal. 4th at 354–55.  *Second*, if the plaintiff has established a

14   prima facie case, "a presumption of discrimination arises.  This presumption, though

15   'rebuttable,' is 'legally mandatory.' . . .  Accordingly, at this trial stage, the burden shifts to the

16   employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a

17   genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken

18   for a legitimate, nondiscriminatory reason."  *Guz*, 24 Cal. 4th at 355–56.  *Third*, "[i]f the

19   employer sustains this burden, the presumption of discrimination disappears.  The plaintiff must

20   then have the opportunity to attack the employer's proffered reasons as pretexts for

21   discrimination, or to offer any other evidence of discriminatory motive.  In an appropriate case,

22   evidence of dishonest reasons, considered together with the elements of the prima facie case,

23   may permit a finding of prohibited bias.  The ultimate burden of persuasion on the issue of

24   actual discrimination remains with the plaintiff."  *Guz*, 24 Cal. 4th at 356.  *See also McDonnell*

25   *v. Douglas Corp. v. Green*, 411 U.S. 792 (1973).

26         Plaintiff Wool has failed to meet the initial burden of establishing a prima facie case of

27   discrimination.  The *McDonnell Douglas* test requires a plaintiff to provide evidence that:

28   (i) she was a member of a protected class; (ii) she was qualified for the position she sought or

14

**United States District Court**
For the Northern District of California

1   was performing competently in the position she held; (iii) she suffered an adverse employment

2   action, such as termination, demotion, or denial of an available job, and (iv) some other

3   circumstance suggests discriminatory motive.  *Guz*, 24 Cal. 4th at 355.[6]

4          Here, it is undisputed that Plaintiff Wool was over 40 years of age when Weil fired her.

5   This order finds that Plaintiff Wool made a very poor showing with respect to the following two

6   requirements — that she performed satisfactorily in the position she held, and that some other

7   circumstance suggested discriminatory motive.  In response to defendant's claim that

8   Plaintiff Wool could not prove age discrimination, plaintiff's counsel offers the following

9   conclusory statements (Opp. 6):

10              What stands out in this case is that Plaintiff Wool received
11              excellent performance evaluations before and after her
                employment with Defendant.  She is a competent legal secretary.
                She is an excellent legal secretary based on the reviews.
12              According to Anita Scelsa, a paralegal for whom Plaintiff Wool
                worked at Defendant, Plaintiff Wool was an excellent, competent
13              legal secretary.  (Scelsa Decl.).  Plaintiff Wool had over ten years
                of legal secretarial experience prior to joining Defendant, and both
14              Partner Adas and Associate Krpata praised her work while she was
                there.

15   Plaintiff Wool then characterizes defendant's reliance on the performance reviews as

16   "nitpicking in the extreme" (*ibid.*).  According to her testimony, the "tardiness issue" had been

17   "resolved."  There was simply "a clear effort to drive her out, to drive her to resign, a pattern

18   that applied to the older secretaries" (*ibid.*).

19          In her entire memorandum, plaintiff's counsel devotes a little less than one page to

20   responding to Weil's criticism that she cannot prove age discrimination (*see* Opp. 6).

21   Plaintiff Wool relies primarily on her own testimony, which is too conclusory and speculative to

22   support her contentions.  Of course, specific testimony by a plaintiff can be sufficient to defeat

23   summary judgment, but not mere conclusory or speculative commentary.  The only third-party

24   evidence Plaintiff Wool provides is a declaration by Anita Scelsa.  The Scelsa declaration

25   stated, in its entirety: "During the time I was employed at Weil, Gotshal & Manges as a

26   paralegal, Julie Wool did some work for me.  Julie Wool was an excellent, competent secretary.

27

28          [6] For the plaintiff to be a member of a protected class, she must be 40 years of age or older.  *See Hersant v. Dept. of Social Services*, 57 Cal. App. 4th 997, 1003 (1997).

Her work was accurate professional and timely.  I have personal knowledge of the foregoing and am competent to testify thereto" (Scelsa Decl. ¶¶ 1–3).  As a paralegal, Ms. Scelsa had no decision-making authority over Plaintiff Wool.  Nothing in this declaration explains when Plaintiff Wool assisted her, the nature of Plaintiff Wool's work, or standards of review.  This order gives the declaration no weight because it is so conclusory.  For all we know, "some work" might have been so inconsequential as to be meaningless against the overall pattern of tardiness and personal telephone calls.

Furthermore, nothing in the record suggests a discriminatory motive on the part of Weil, which is the fourth *Guz* factor.  Even when viewing the evidence in the light most favorable to the non-movant, no jury could reasonably conclude that Weil discriminated against Plaintiff Wool on the basis of her age.  Her testimony of discrimination is too far attenuated to support such a claim.  *First*, Partner Adas allegedly seemed "shocked" and "surprised" when he learned of her age, and, as a result, changed his attitude towards her.  Plaintiff Wool, however, could not recall whether he made any negative comments about her age.  When asked what caused her to believe that the change in attitude was due to her age (aside from timing), she answered, "No, I guess I can't pinpoint anything" (Wool Dep. 34).  *Second*, during his brief stint at Weil, Associate Miller allegedly said to Plaintiff Wool that she was "not as good of a secretary that he would expect of someone [her] age" (*id.* at 60).  It is not apparent why this might translate necessarily to age discrimination, for it is natural to expect more experienced employees to be more skilled.  But at all events there is no evidence that Associate Schiller had any effect on her termination.  *Third*, she claimed that younger employees were being treated more leniently.  But one such employee (Anne Hansen) named by Plaintiff Wool was actually older than Plaintiff Wool.  *Fourth*, Plaintiff Wool characterized innocuous comments such as "show time" and having "enthusiasm" as being age-related comments.  None of these "facts" supports Plaintiff Wool's contentions.  It is mere speculation and argument.[7]

_____

[7] Although he did not cite it in his memoranda, during oral argument plaintiff's counsel referred to *Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470 (9th Cir. 1995), for the proposition that words like "enthusiasm" can support a jury verdict of age discrimination.  The Ninth Circuit in *Mangold* did *not* draw such a far-fetched conclusion.  Admittedly, it did say that the jury was entitled to draw reasonable inferences

United States District Court

For the Northern District of California

During oral argument, plaintiff's counsel also referred to Plaintiff Wool's testimony that Associate Hsu, a supervising attorney, was allegedly instructed to treat Plaintiff Wool badly. In his single-page analysis of how Plaintiff Wool can prove age discrimination, plaintiff's counsel made no mention of the testimony. The Ninth Circuit has stated, "It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Nonetheless, the Court has examined the record and found that Plaintiff Wool's deposition about Associate Hsu did not support any claim of age-discrimination. The deposition went as follows (Wool Dep. at 122):

> Q: Do you have any reason to believe that Ms. Hsu treated you differently than she treated younger employees?
>
> A: Well, she was treating me differently, but I don't know — she treated Michelle Lippert with care and attention and [was] very, very friendly. To me she was friendly up until the list was passed out, which I call the hit list, which I believe there was something of that nature, and she implied so much to me. She actually said to me one time that it bothered her that she had to treat me the way she — the higher-ups were instructing her to treat me, because it didn't feel right, but yet she had to. This is the gist of it. I don't have the word for word, but it was like she felt she was being strong-armed into treating me coldly,

---

from a letter from an employer that read, in part, "[A]ll of us should emulate the enthusiasm, tenacity and creativity with which many of our newer employees attack and solver problems . . . I believe, as do many others, that employees new to a job tend to be less inhibited by traditional methodologies than those who have been on the same assignment for a long time." *Id.* at 1475 n. 4. The court of appeals, however, also stated that the following *substantial* evidence supported the jury's findings of age discrimination in *Mangold*: a manager told the plaintiff, "Maurice, you know we want fresh young blood in this group"; after the plaintiff told the manager that he had completed certain graduate courses, the manager said, "You're still too old"; a former supervisor of the plaintiff testified that duty statements and the examination process were altered to allow younger people to be placed on promotion lists; another former supervisor testified that high-profile assignments were given to younger employees; an office memorandum stated, "The [employer's] overall effort should be to keep as many of our younger, talented staff employed within the constraints of civil service rules"; a previous rater of the plaintiff admitted that he was asked to lower the plaintiff's evaluation while raising the evaluation of a younger employee; there was testimony that the subjective oral examinations consisted of questions that could only be answered correctly by those who held certain positions given to younger people; there was additional testimony that performance evaluations of older workers had been changed to influence promotion ratings; the president/executive director gave a speech saying, "We're going into a bright new future in which we have an excellent staff of young professional people who will be able to carry us into this bright new future by virtue of their superb education and training"; in response to a question during the speech, the president/executive director allegedly responded with words to the effect of, "The older employees, unfortunately, don't take advantage of all the opportunities that are offered to them." *Id.* at 1475. The plaintiffs in *Mangold* had a substantially stronger case of age discrimination than Plaintiff Wool does here.

United States District Court

For the Northern District of California

disrespectfully, and harassingly, which she no doubt did.

Q: Did Ms. Hsu say anything negative about age that you were aware of?

A: She might have said something about her own age.  She's not happy about turning 25 or something.  She's very young.

Q: Do you remember Ms. Hsu making —

A: Yeah.

Q: — any age-related comments?

A: Yeah, that she was getting old.

Q: Do you remember Ms. Hsu making any negative comments about older workers?

A: No, not to my recollection.

No reasonable jury could conclude from this deposition that Plaintiff Wool was subjected to age discrimination.  At best, it shows that Associate Hsu was instructed to specially watch Plaintiff Wool's performance.  Nothing hints at age discrimination.

Plaintiff's counsel also brought up at oral argument — again, for the first time and without citing to the record — that the reason Plaintiff Wool entered incorrect punch times was because she was told to round off to the nearest hour.  After rummaging through the record, the Court found Plaintiff's Wool's deposition purportedly supporting this point: "That this was so ridiculous that they were clocking me in at times when they didn't even check out my departure time, and accusing me of entering it improperly when I was told to round back to the nearest hour.  And so I wasn't lying or trying to thief 10 minutes here and there" (*id.* at 162).  Viewing this evidence in the light most favorable to the nonmovant, this order assumes that Plaintiff Wool was told to round her times to the nearest hour and was therefore not intentionally lying about her punch times.  Nonetheless, even if Plaintiff Wool followed firm policy on entering her punch times, she still arrived late to work on a frequent basis.  None of the arguments raised in plaintiff's memoranda or oral argument show age discrimination.

United States District Court
For the Northern District of California

1                                    *             *              *

2          Even assuming *arguendo* that she established a prima facie case of age discrimination,

3   Plaintiff Wool's position remains unpersuasive.  The burden at this point would shift to Weil to

4   rebut the presumption by producing admissible evidence that its action was taken for a

5   legitimate, nondiscriminatory reason.  Defendant has successfully done so.  Each summer from

6   2001 through 2004, Plaintiff Wool received annual performance reviews.  Although they had

7   positive remarks, all of the reviews discussed Plaintiff Wool's problems with punctuality.

8   Other common problems were: she frequently allowed projects and documents to sit on her desk

9   for long periods of time, she made errors while editing documents, she took long lunches,

10  and she spent too much on the phone making personal calls.

11         In October 2001, the head of human resources met with Plaintiff Wool to discuss the

12  problem of lengthy lunches.  In January 2004, the human resources administrator also met with

13  Plaintiff Wool to address Plaintiff Wool's tardiness.  Two months later, Plaintiff Wool was sent

14  a letter warning her to match actual arrival times with "punch times" — Plaintiff Wool

15  frequently arrived at least fifteen minutes late, but her punch time would read 9:00 a.m.

16  Plaintiff Wool signed this memorandum, beneath the sentence that read, "I acknowledge

17  receiving the above written warning and understand that failure to improve my punctuality and

18  to accurately punch in at the time I actually arrive, may lead to termination of my employment"

19  (Wool Dep. Exh. 4).

20         Plaintiff Wool then received a "support staff performance review compilation" in

21  June 2004 that listed numerous areas of concern and warned of potential disciplinary action.

22  According to Plaintiff Wool's deposition, she knew at this point that she was on probation and

23  would be reviewed again in three months — with the possible consequence of disciplinary

24  action.  The September 2004 follow-up review acknowledged her efforts to improve but still

25  deemed them to be insufficient.  The letter stated that she would be reviewed in another three

26  months, after which deficient performance "may result in further disciplinary action, including

27  possible dismissal from the Firm without the issuance of another warning or improvement

28  period" (Wool Dep. Exh. 7).  Weil delivered its final warning in January 2005.  The four-paged,

single-spaced letter went into great detail about her "ongoing performance issues." This letter gave notice that it was the final warning (Wool Dep. Exh. 8). Partner Adas and other attorneys at Weil subsequently discussed Plaintiff Wool's poor job performance and finally decided to fire her on April 14, 2005.

This order finds that Weil terminated Plaintiff Wool's employment for legitimate, non-discriminatory reasons and that no reasonable jury could find otherwise on this summary judgment record. Plaintiff Wool was simply a deficient employee who came to work late and who made too many personal calls, among other things. Moreover, the firm gave her ample opportunity to reform. Aside from the annual performance reviews, there were at least four warning letters before Plaintiff Wool was actually fired. The warning letters pointed out her areas of concern and that she was at risk for disciplinary action or employment-termination. Weil has produced overwhelming evidence that the firm acted properly.

Because Weil has sustained its burden, the presumption of discrimination disappears. Plaintiff Wool now has the burden of showing that Weil's reasons were mere pretexts for discrimination. "To establish that [a defendant's] nondiscriminatory explanation is a pretext for discrimination, [plaintiffs] may rely on circumstantial evidence, which we previously have said must be 'specific' and 'substantial' to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007). In *Nilsson*, during a deposition, a police officer job applicant stated that her friend told her that she was a "legal risk" and, based on that, "it appeared" that the legal risk was a reference to a previous EEOC complaint. The job applicant also tried to establish pretext by referring to another officer's testimony that the hiring board initially denied her application because she had engaged in prior litigation against a former place of employment. The Ninth Circuit in *Nilsson* concluded that the job-applicant plaintiff had failed to meet her burden of raising a genuine issue of material fact with respect to pretext. Summary judgment was granted in favor of the defendant employer.

As discussed earlier, Plaintiff Wool provides no evidence whatsoever (direct, circumstantial or statistical) of dishonest reasons that permit a finding of prohibited bias. Rather, Weil proffered a lengthy and detailed record of Plaintiff Wool's shortcomings.

United States District Court

For the Northern District of California

20

United States District Court

For the Northern District of California

1   Because plaintiff has failed to meet the ultimate burden of persuasion on the issue of

2   discrimination, summary judgment is granted in favor of defendant.

3                                              **CONCLUSION**

4           For the foregoing reasons, defendant's motion for summary judgment is **GRANTED**.

5

6           **IT IS SO ORDERED.**

7

8   Dated:  March 24, 2008.
                                                    _____
9                                                   WILLIAM ALSUP
                                                    UNITED STATES DISTRICT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28